**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNION PACIFIC RAILROAD
COMPANY,

             Plaintiff,

vs.

CEDAR RAPIDS AND IOWA CITY
RAILWAY COMPANY,

             Defendant.

No. C 05-166-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING THE
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   *A. Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . 10
   *B. UP's Express Contract Claim* . . . . . . . . . . . . . . . . . . . . . . . . 13
      *1. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . . 13
         *a. CRANDIC's opening argument* . . . . . . . . . . . . . . . . 13
         *b. UP's response* . . . . . . . . . . . . . . . . . . . . . . . . . . 13
         *c. CRANDIC's reply* . . . . . . . . . . . . . . . . . . . . . . . . 15
      *2. Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      *3. Application of the law* . . . . . . . . . . . . . . . . . . . . . . . . . 19
   *C. UP's Implied Contract Claim* . . . . . . . . . . . . . . . . . . . . . . . 25
      *1. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . . 25
         *a. CRANDIC's opening argument* . . . . . . . . . . . . . . . . 25
         *b. UP's response* . . . . . . . . . . . . . . . . . . . . . . . . . . 26
         *c. CRANDIC's reply* . . . . . . . . . . . . . . . . . . . . . . . . 27
      *2. Applicable law and analysis* . . . . . . . . . . . . . . . . . . . . . 27

a.     *Preliminary matters* . . . . . . . . . . . . . . . . . . . . . . . 27
    i.     *Bar by express contract claim* . . . . . . . . . . . 28
    ii.    *Statute of frauds* . . . . . . . . . . . . . . . . . . . . 28
    iii.   *Nature of the claim* . . . . . . . . . . . . . . . . . . 29
b.     *Substance of the claim* . . . . . . . . . . . . . . . . . . . . 34
    i.     *"Implied in fact" contract claim* . . . . . . . . . . 35
    ii.    *"Promissory estoppel" claim* . . . . . . . . . . . . . 36
    iii.   *"Unjust enrichment" claim* . . . . . . . . . . . . . . 38

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

One railroad contends that another railroad has breached an express written contract or an implied-in-fact contract to pay a share of the costs to construct a rail interchange yard between the two railroads' lines to improve service by both railroads to a key customer. In a motion for summary judgment, the defendant railroad asserts that the plaintiff breached the conditions precedent in the parties' written contract and then decided to go forward on its own with the construction project, precluding recovery on either an express or implied contract theory. The plaintiff contends that summary judgment is not appropriate, because there are at least genuine issues of material fact that it substantially satisfied the conditions precedent in the written contract and, in the alternative, that it would be unfair to allow the defendant to reap the benefits of the newly constructed interchange yard without paying its fair share of the construction costs. Despite voluminous briefing by the parties, the court finds that the material issues are relatively few and quickly resolved.

## I. INTRODUCTION

### A. Factual Background

The court will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, the court will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendant's motion for summary judgment. The court will then discuss specific factual disputes, and the extent to which they may be material, in the context of pertinent portions of its legal analysis.

Plaintiff Union Pacific Railroad Company (UP) is an international transportation company with its principal place of business in the State of Nebraska. Defendant Cedar Rapids and Iowa City Railway Company (CRANDIC) is a "shortline" railroad with its principal place of business in Cedar Rapids, Iowa. CRANDIC has approximately 60 miles of main line track between Cedar Rapids and Iowa City, Iowa, and between Cedar Rapids and Amana, Iowa. The parties appear to agree that CRANDIC's stock is owned by non-party Alliant Energy Corporation (Alliant). Non-party Archer Daniels Midland (ADM) is an international food production and processing company with a major plant in southwest Cedar Rapids, near tracks owned by both UP and CRANDIC.[1]

In 2001 or 2002, UP, CRANDIC, and ADM rekindled discussions for construction of additional tracks in Fairfax, Iowa, (the Fairfax project) to improve operations of both railroads and, in particular, to facilitate handling of "solid" or "unit" trains to ADM, thereby reducing the need to break up strings of cars and to perform multiple switching operations. Those discussions eventually ripened into a "Letter Agreement" dated June

---

[1]The parties' statements of facts are ambiguous as to whether they jointly own tracks near ADM's plant or each solely owns tracks near ADM's plant. That ambiguity, however, is not material to the issues in this case.

3

14, 2002, drafted and signed by John Rebensdorf, Vice President of Network Service and Planning,[2] to Paul Treangen, the Vice President and General Manager of CRANDIC. The body of the Letter Agreement, in its entirety, provided as follows:

Dear Paul:

Union Pacific, CRANDIC and Archer Daniels Midland ("ADM") agree to construct two interchange tracks connecting UP and CRANDIC trackage near Fairfax, Iowa. Ownership and financing of the two tracks will be as follows:

1. ADM and the two railroads will share in the estimated $7.28 million cost of constructing the two Fairfax tracks as follows: ADM - $3.64 million 950%), UP - $2.64 million (36.3%), CRANDIC - $1.0 million (13.7%). In the event that the actual cost of the project differs from the estimated $7.28 million cost (either over or under), the difference will be shared by the parties based on the percentages stated above.

2. ADM's share will be paid back by UP over a five-year period with interest based on a per car refund of $26 on each loaded car moved in or out of the ADM Cedar Rapids facility with a UP line-haul move.

3. UP and CRANDIC will share the cost of the remaining $3.64 million as follows:

   A. UP will fund up-front the case cost of $3.64 million.

---

[2] In August 2003, Rebensdorf became the Vice President of Network Planning and Operations.

4

B.   CRANDIC will pay UP $1.0 million (or 13.7%) of the total construction cost) as its share of the cost of constructing the Fairfax interchange tracks at completion of the two Fairfax interchange tracks, but no earlier than January 2003.

4.   After five years, the ownership of the two Fairfax interchange tracks will be 86.3% UP and 13.7% CRANDIC.   Maintenance and any further capital spent on the two tracks will be split based on ownership.

5.   UP and CRANDIC agree to hold rates for switching between the two railroads in Cedar Rapids level for five years.

This agreement between UP and CRANDIC to construct the two tracks at Fairfax will be contingent on the following:

1.   Participation by ADM on the terms described in item (2) above and consummation of an agreement between ADM and UP.

2.   Approval by the Alliant Energy Corporation Board of Directors of a CRANDIC Capital Budget for 2003 that includes the payments to UP described in Paragraph 3(B) above.

3.   Negotiation of an operating agreement between UP and CRANDIC covering the two Fairfax tracks.

Construction of the two Fairfax interchange tracks will begin as soon as agreements are signed between CRANDIC and UP and UP and ADM.

5

> If this is agreeable to CRANDIC, please sign both
> copies of this letter, returning one copy to me and retaining the
> other for your file.

Defendant's Appendix at 8-9. Paul Treangen signed the Letter Agreement on June 27, 2006, on behalf of CRANDIC, evidencing CRANDIC's agreement to the terms of the Letter Agreement.

UP admits that neither part of the first contingency in the Letter Agreement was ever satisfied—that is, there was no participation by ADM in paying the cost of construction and no consummation of an agreement between ADM and UP concerning such participation—despite UP forwarding ADM two drafts of a proposed agreement between UP and ADM in accordance with the first contingency of the Letter Agreement. UP also admits that CRANDIC was never presented with, and never executed, any agreement to amend the Letter Agreement to remove this contingency. However, UP contends that the essence of the first contingency was met, because UP decided to and did pay up front ADM's share of the construction costs of the Fairfax project. Similarly, UP admits that no operating agreement between UP and CRANDIC concerning the Fairfax interchange tracks was completed before construction of the tracks began, as required by the third contingency in the Letter Agreement. UP contends, however, that while it was the intent of the parties that the operating agreement would be completed before construction began, they recognized that the agreement might not be in place before construction began, because nobody wanted to delay the track building project. Although UP admits that CRANDIC sent UP a "redline mark-up" of a proposed operating agreement on July 15, 2002, UP admits that it then "ceased negotiating" over the terms of the operating agreement, explaining that it did so, because language proposed by CRANDIC concerning shared liability was deemed "unreasonable" by UP. UP points out, however, that it eventually entered into an operating agreement with CRANDIC for the Fairfax

6

interchange tracks in May 2005, albeit several months after the construction of those tracks was actually completed. In contrast, UP admits that the second contingency *was* fulfilled, precisely as stated, because Alliant's Board of Directors did approve a CRANDIC capital budget for 2003 that included the payment to UP described in paragraph 3(B) of the Letter Agreement and that CRANDIC had money in place in its 2003 budget consistent with the Letter Agreement.

In the spring of 2003, Rebensdorf told Treangen in a telephone conversation that permitting issues and financial issues would delay the Fairfax project and that he thought it was very likely that the project was not going to be completed in 2003. CRANDIC contends that it is undisputed that Treangen told Rebensdorf that CRANDIC had the money for the project booked only for 2003, but UP contends that Treangen indicated only that Alliant's Board of Directors had approved the Fairfax project for CRANDIC's 2003 capital budget. Rebensdorf testified in deposition that railroads all over the country have projects that carry over into succeeding years, so that he did not believe that budgeting of an item only in the 2003 budget was significant and that CRANDIC did not otherwise indicate that it would not contribute to the project if it was not completed by December 31, 2003. He also testified that the Letter Agreement contains no completion date for the Fairfax project. CRANDIC contends that, late in 2003, Treangen again informed Rebensdorf that CRANDIC had the money for the Fairfax project booked only for 2003 and could not carry over the funds for the project past 2003, but UP contends that it believed Treangen knew that the project was going to carry over into 2004 and that UP expected that CRANDIC would fulfill its commitment.

Eventually, after communication and negotiation between UP and local government officials, to which CRANDIC was not a party, permitting issues were resolved, and in March 2004, UP went forward with construction of the Fairfax interchange tracks, which

7

the parties now describe as the Fairfax Yard. UP did so, however, without the involvement of ADM. Instead, UP paid all of the up front costs of the construction. Although CRANDIC contends that it was not included in any discussions of the construction plans or process, UP contends that UP employees were talking to CRANDIC employees about the Fairfax Yard project, including a meeting in February 2004 to go over the design of the two tracks. In July 2004, after observing that UP was constructing the tracks at Fairfax, CRANDIC reinitiated contact with UP with respect to an operating agreement for the Fairfax Yard. CRANDIC contends that, irrespective of the Letter Agreement, such an operating agreement was required, if *both* parties were to use the Fairfax Yard. UP contends that *neither* party could use the Fairfax Yard without such an operating agreement, so that none of the parties to the Letter Agreement could reap any benefit from the investment in the Fairfax Yard without such an operating agreement. The Fairfax Yard was completed the first week of November 2004, but it then stood idle, because CRANDIC and UP had not yet reached agreement on the terms of an operating agreement.

CRANDIC contends that, in November 2004, Don Christensen, the Director of Joint Facilities for the Northern Region for UP, had a meeting with representatives of CRANDIC in which he conceded that the contingencies in the Letter Agreement had not been met and that the parties should proceed on the basis that UP would maintain 100% ownership of the tracks and treat the interchange tracks as another Cedar Rapids interchange yard. CRANDIC contends that its representatives agreed to Christensen's suggestion concerning ownership and treatment of the Fairfax Yard. CRANDIC asserts that Christensen then suggested that the parties pursue a separate operating agreement, which is what ultimately happened. UP disputes Christensen's actual, implied, or apparent authority to release CRANDIC from its obligations under the Letter Agreement. In any

8

event, the parties finally reached agreement on the terms of an operating agreement on May 2, 2005, and the Fairfax Yard then came into operation.

CRANDIC has declined to pay any part of the construction cost of the Fairfax Yard project, leading to this litigation.

## B.  *Procedural Background*

On October 19, 2005, UP filed a Complaint (docket no. 3) against CRANDIC, invoking the diversity jurisdiction of this court, and asserting a claim for breach of the June 2002 Letter Agreement to share costs for construction of the Fairfax Yard. CRANDIC filed an Answer (docket no. 7) on December 29, 2005, denying UP's claim and asserting various affirmative defenses, including UP's alleged failure to perform or satisfy the conditions precedent stated in the Letter Agreement.  UP was denied leave to file a First Amended And Substituted Complaint by Order dated May 9, 2006 (docket no. 17), based on failure to comply with applicable local rules, but was granted leave to file a Second Amended And Substituted Complaint (docket no. 20) on May 15, 2006.  In its Second Amended Complaint, UP added to its breach-of-contract claim a claim denominated "Contract Implied In Fact," in which it alleges that it built the Fairfax Yard in reasonable reliance on CRANDIC's promise to pay 13.7% of the construction costs, that CRANDIC allowed UP to proceed with construction of the Fairfax Yard without advising UP that it did not intend to pay its share of the construction costs, and that CRANDIC is, therefore, obligated to pay 13.7% of the construction costs under a contract implied in fact.  On both of its claims, UP seeks $1,287,800 in damages as CRANDIC's share of the construction costs, plus interest and costs of this action.  CRANDIC filed its Answer (docket no. 21) to UP's Second Amended And Substituted Complaint on June 21, 2006, in which it denied both of UP's claims and asserted affirmative defenses alleging, *inter*

Case 1:05-cv-00166-MWB   Document 36   Filed 02/09/07   Page 9 of 40

*alia*, failure of UP's express contract claim based on UP's failure to perform or satisfy the conditions precedent to the Letter Agreement and failure of UP's implied contract claim based on the statute of frauds. A bench trial in this matter is set to begin on March 12, 2007.

In a Motion For Summary Judgment (docket no. 25), filed November 11, 2006, CRANDIC contends that no trial is required, because both of UP's claims fail as a matter of law on the undisputed facts in the record. On December 29, 2006, UP filed a Resistance (docket no. 28) to CRANDIC's Motion For Summary Judgment, and on January 17, 2007, CRANDIC filed a Reply (docket no. 34) in further support of its motion.

Pursuant to CRANDIC's request, the court set oral arguments on CRANDIC's Motion For Summary Judgment for February 5, 2007. At the oral arguments, plaintiff UP was represented by Bruce E. Johnson of the Cutler Law Firm, P.C., in West Des Moines, Iowa. Defendant CRANDIC was represented by Sean W. McPartland of Lynch Dallas, P.C., in Cedar Rapids, Iowa. CRANDIC's Motion For Summary Judgment is now fully submitted.

## II. *LEGAL ANALYSIS*

### A. *Summary Judgment Standards*

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. FED. R. CIV. P. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.

R. Civ. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377. Furthermore, "where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and

11

admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

CRANDIC contends that it is entitled to summary judgment under these standards on both UP's express and implied-in-fact contract claims. UP denies that summary judgment is appropriate on either claim.

### B. UP's Express Contract Claim

### 1. Arguments of the parties

#### a. CRANDIC's opening argument

CRANDIC contends that UP's express contract claim, based on alleged breach of the June 2002 Letter Agreement, fails as a matter of undisputed fact and law, because UP failed to meet two of the conditions precedent to CRANDIC's performance under the contract. CRANDIC contends that the Letter Agreement was drafted by Rebensdorf, so that it should be construed against UP. However, CRANDIC argues that Rebensdorf's definition of "contingency" as a condition that had to be completed in order to fully implement the terms of the agreement is consistent with applicable law. CRANDIC asserts that the only contingency actually met was authorization by Alliant's board of CRANDIC's share of the funding of the project in CRANDIC's 2003 budget. In contrast, CRANDIC argues that ADM never participated in the project or consummated an agreement with UP to do so, and no operating agreement for the Fairfax Yard was in place before UP unilaterally undertook construction of the project. CRANDIC also argues that UP is equitably estopped to claim any breach by CRANDIC of the Letter Agreement, because UP's representative, Don Christensen, acknowledged that UP had not met two of the three contingencies to CRANDIC's performance.

#### b. UP's response

In response, UP argues that it has raised genuine issues of material fact on the elements of its claim of breach of an express contract. UP argues, first, that the Letter Agreement cannot be construed against it, as the drafter, where the Letter Agreement was prepared under the scrutiny of CRANDIC's legal counsel. Turning to the requirements of its claim, UP also argues that each of the three contingencies, not just one, were met, or that there are genuine issues of material fact that the "essence" of those contingencies

13

was met. UP contends that the essence of the first contingency was met, because UP paid up front ADM's one half share of the construction costs. UP agrees with CRANDIC that the second contingency was met when Alliant's board of directors authorized CRANDIC's share of the construction costs in CRANDIC's 2003 budget. UP contends that the third contingency was also met, because CRANDIC admits that an operating agreement for the Fairfax Yard was executed on May 2, 2005. Thus, UP asserts that there is now no bar to UP's demand for immediate performance by CRANDIC of its obligation to pay its share of the construction costs of the Fairfax Yard under the Letter Agreement.

Even assuming that UP technically breached the challenged contingencies, however, UP argues that the breaches were not sufficiently material to permit CRANDIC to rescind the Letter Agreement. More specifically, UP argues that lack of an operating agreement before construction of the Fairfax Yard hurt only UP, but was not material as to CRANDIC, because UP faced the prospect of not being able to use its investment without an operating agreement. Similarly, UP argues that lack of participation by ADM did not prevent construction of the yard, where UP paid ADM's share of the construction costs, so that the absence of ADM's participation did not affect the availability of any of the benefits of the Fairfax project to CRANDIC. Next, UP argues that it could waive the challenged contingencies, without voiding the contract, because those contingencies were solely for UP's benefit. UP argues that the participation of ADM was solely meant to insure that UP would not have to bear all of the up front costs of the construction project, and that execution of an operating agreement prior to construction would only have prevented UP from making an investment that it could not use immediately.

Finally, UP argues that CRANDIC waived its right to rescind the contract based on alleged breach of the contingencies, because CRANDIC allowed UP to perform the contract, even though CRANDIC knew of the supposed breach of the contingencies,

14

without notice to UP that CRANDIC claimed breaches entitling it to rescind the contract. UP argues, further, that the UP representative who supposedly acknowledged UP's failure to meet the conditions precedent to the contract did not have actual, implied, or apparent authority to offer such an acknowledgment, because he was simply too low in the corporate hierarchy to have such authority.

### c. CRANDIC's reply

In its reply in further support of its motion for summary judgment on UP's express contract claim, CRANDIC contends that UP concedes that it did not satisfy the conditions precedent in the Letter Agreement, and that those conditions precedent were material to the agreement between the parties, not solely for UP's benefit. More specifically, CRANDIC contends that the essence of the Letter Agreement was that *all three entities*—UP, CRANDIC, and ADM—would participate financially in and benefit financially from the Fairfax project. CRANDIC argues that ADM's participation was material, because it made it more likely that ADM would use the Fairfax Yard and pay the per car charges to recoup its investment, thus ensuring that the Fairfax Yard would continue to be of benefit to CRANDIC and UP. For much the same reason, CRANDIC argues that ADM's participation was not *solely* for UP's benefit, so that UP was not entitled to waive unilaterally the condition precedent of ADM's participation. CRANDIC contends that the benefits of ADM's participation to CRANDIC were obvious and known to UP, because even UP acknowledges that ADM's participation would provide ADM with an incentive to use the tracks to recoup its investment allowing CRANDIC to receive per car charges for cars going to ADM. Moreover, CRANDIC argues that the requirement of an operating agreement for the Fairfax Yard before construction on that project began was material and not solely for UP's benefit, because such an agreement would ensure that both railroads could recoup their investment, where neither railroad could gain the benefits

15

of the yard without such an agreement. CRANDIC disputes UP's contention that it was a foregone conclusion that the parties would enter into an operating agreement for the Fairfax Yard, because CRANDIC contends that UP could use the track without CRANDIC's agreement, and UP was not even bothering to negotiate with CRANDIC for an operating agreement when UP began constructing the tracks.

CRANDIC also asserts that it did not waive any right to demand performance of the conditions precedent. CRANDIC contends that it did not accept UP's unilateral performance, because both parties knew that UP had not met the conditions precedent to CRANDIC's performance when UP began construction, and both parties knew that CRANDIC would have no right to use the tracks upon completion of the yard absent an operating agreement. Moreover, CRANDIC argues that it communicated to UP twice in 2003 that it would not be in a position to contribute financially to the project after 2003, so that CRANDIC had every reason to believe, and UP had every reason to know, that UP had decided to go it alone, when UP started construction without either ADM's or CRANDIC's participation.

Finally, CRANDIC reiterates its contention that UP is equitably estopped to assert CRANDIC's alleged breach, because UP's representative, Christensen, acknowledged in the November 2004 conference call that CRANDIC's contribution was no longer applicable and suggested that UP take sole ownership of the Fairfax Yard. CRANDIC contends that no limitation on Christensen's authority to make such statements was ever communicated to CRANDIC until after UP filed suit.

### 2. Applicable law

Although UP cites decisions from various jurisdictions in support of its contentions, the parties do not appear to dispute that Iowa law applies to UP's express contract claim. Under Iowa law, "[c]onditions precedent are those facts and events, occurring subsequent

16

to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, and before the usual judicial remedies are available." *Employee Benefits Plus, Inc. v. Des Moines Gen. Hosp.*, 535 N.W.2d 149, 154 (Iowa 1995) (citing *Khabbaz v. Swartz*, 319 N.W.2d 279, 283 (Iowa 1982)); *accord ARDI Exchange v. Valley Nat'l Bank*, 493 N.W.2d 862, 864 (Iowa 1992) (also citing *Khabbaz* for this definition). "The fact that a certain performance is required on the part of one of the contracting parties does not necessarily render it a condition precedent to the enforcement of any performance on the part of the other party to the agreement." *Pirkl v. Northwestern Mut. Ins. Ass'n*, 348 N.W.2d 633, 636-37 (Iowa 1984). Rather, "[a] determination that a condition precedent exists depends not on the particular form of words used, but upon the intention of the parties gathered from the language of the entire instrument." *Gerard v. Peterson*, 448 N.W.2d 699, 701 (Iowa Ct. App. 1989) (internal quotation marks omitted) (quoting *Khabbaz*, 319 N.W.2d at 283, in turn quoting *Davis & Co. v. Cobban,* 39 Iowa 392, 393 (1874)). Thus, the court looks for language of the contract demonstrating that both parties to the contract intended the transaction to be contingent upon the purported condition precedent. *Id.* The effect of failure to perform a condition precedent is that it "generally vitiates the contract." *Employee Benefits Plus, Inc.*, 535 N.W.2d at 155 (citing *Bruggemeyer v. Bruggemeyer*, 258 N.W.2d 364, 366 (Iowa 1977)).

The Iowa Supreme Court has recognized that there may be situations in which substantial performance of a contract term will suffice:

> Substantial performance is that which, "despite deviations from the contract requirements, provides the important and essential benefits of the contract to the promisee." 17B C.J.S. *Contracts* § 589, at 279 (1999); *see, e.g., Johnson v. Dodgen,* 451 N.W.2d 168 (Iowa 1990). The doctrine is intended to protect the right of compensation of those who have performed

17

> in all material and substantive particulars, and it excuses
> contractual deviations or deficiencies which do not severely
> impair the purpose underlying a contractual provision. 17B
> C.J.S. § 589, at 278.

*SDG Macerich Properties, L.P. v. Stanek, Inc.*, 648 N.W.2d 581, 586 (Iowa 2002). However, the Iowa Supreme Court has also recognized that "[s]ubstantial performance will not excuse the nonoccurrence of an express condition precedent to a contract." *Id.* (citing 17B C.J.S. Contracts § 589, at 278). Thus, assertions that a party's performance of a condition precedent was "close enough" cannot save that party from its failure to timely fulfill a condition precedent. *Id.*

Although substantial performance of a condition precedent is not enough, "'[a] party to a contract who is entitled to the performance of a condition precedent may waive it either expressly or by conduct indicating waiver.'" *ARDI Exchange*, 493 N.W.2d at 865 (quoting *Mosebach v. Blythe,* 282 N.W.2d 755, 760 (Iowa Ct. App. 1979)); *accord Pierce v. Farm Bureau Mut. Ins. Co.*, 548 N.W.2d 551, 557 (Iowa 1996) ("A party may waive a condition precedent to the party's own performance of a contractual duty without affecting the validity of an executory real estate contract.") (citing *H.L. Munn Lumber Co. v. City of Ames*, 176 N.W.2d 813, 816 (Iowa 1970)). A party must be more than entitled to the performance of the condition precedent, however, to waive it; the condition precedent must be *solely for* that party's benefit. *Rodgers v. Baughman*, 342 N.W.2d 801, 806 (Iowa 1983) ("A party may waive a condition precedent to his own performance of a contractual duty, when such condition precedent exists for his sole benefit and protection, and compel performance by the other party who has no interest in the performance or nonperformance of the condition."); *Dergo v. Kollias*, 567 N.W.2d 443, 444 (Iowa Ct. App. 1997) ("Parties to a contract may waive a condition precedent to their performance of an obligation under the contract when the condition exists for their sole benefit and

18

protection. The waiving party may then compel performance by the other party to the contract who has no interest in the performance or nonperformance of the condition.") (internal citations omitted) (citing *Rogers*). Whether a condition precedent exists for the sole benefit of one party is a question of fact. *Dergo*, 567 N.W.2d at 444. Implied waiver of a condition precedent, that is, waiver by conduct, occurs where a party continues performance or accepts performance of the other party, or engages in other words or conduct inconsistent with that party's intention to rely on the requirements of the contract, despite knowledge that the condition precedent has not been met. *Employee Benefits Plus, Inc.*, 535 N.W.2d at 156; *ARDI Exchange*, 493 N.W.2d at 865.

### 3. Application of the law

The June 2002 Letter Agreement at issue here plainly states, "This agreement between UP and CRANDIC to construct the two tracks at Fairfax will be contingent on" three numbered conditions: (1) "[p]articipation by ADM on the terms described in item (2) above and consummation of an agreement between ADM and UP"; (2) "[a]pproval by the Alliant Energy Corporation Board of Directors of a CRANDIC Capital Budget for 2003 that includes the payments to UP described in Paragraph 3(B) above"; and (3) "[n]egotiation of an operating agreement between UP and CRANDIC covering the two Fairfax tracks." Letter Agreement, Defendant's Appendix at 9. The court notes that the Letter Agreement expressly adds another unnumbered condition, that "[c]onstruction of the two Fairfax interchange tracks will begin as soon as agreements are signed between CRANDIC and UP and UP and ADM." Letter Agreement, Defendant's Appendix at 9. Thus, not only was the parties' obligation to perform conditioned upon the three numbered conditions, but *the commencement of construction* of the Fairfax Yard project was conditioned upon the execution of an agreement between CRANDIC and UP, for operation

of the yard, and between UP and ADM, for ADM's participation in the funding of the construction.

There is no question, looking at the language of the Letter Agreement, that the three numbered "contingencies" and the further contingency of execution of agreements were "events, occurring subsequent to the making of a valid contract, that must exist or occur before there is a right to immediate performance," in that the Letter Agreement plainly states that CRANDIC had no obligation to pay any share of the construction costs until the stated contingencies were met, and that those terms, therefore, fit the definition of "conditions precedent" under Iowa law. *See Employee Benefits Plus, Inc.*, 535 N.W.2d at 154 (so defining "condition precedent"). Moreover, from the plain language of the Letter Agreement, there can be no dispute that the parties intended the transaction involving construction of the Fairfax Yard and CRANDIC's contribution to the costs of that construction to be contingent upon the three numbered contingencies and the unnumbered contingency requiring execution of other agreements stated therein, because that is precisely and unambiguously what the Letter Agreement says. *See Gerard*, 448 N.W.2d at 701 (whether a condition precedent exists depends upon intent of the parties, not a particular form of words, and the court looks for language in the contract demonstrating that the parties intended to make the transaction contingent upon the purported condition precedent). It is also undisputed that two of the numbered contingencies, ADM's participation and the execution of an operating agreement between CRANDIC and UP, and the further unnumbered contingency requiring execution of other agreements, between UP and ADM and between UP and CRANDIC, either never occurred or did not occur before construction of the Fairfax Yard project began. These failures to satisfy the conditions precedent to the parties' performance "vitiate[d] the contract" as a matter of law. *Employee Benefits Plus, Inc.*, 535 N.W.2d at 155.

20

UP, nevertheless, argues that it substantially performed the first contingency, participation by ADM in funding of the construction and execution of an agreement for such participation, because UP paid up front ADM's share of the construction costs. Leaving aside UP's attempts to generate genuine issues of material fact that its substantial performance of this contingency provided CRANDIC with all of the important and essential benefits of the contract, *see SDG Macerich Properties, L.P.*, 648 N.W.2d at 586 (defining "substantial performance" as providing the important and essential benefits of the contract to the promisee, despite deviation from contract requirements), UP's argument is to no avail, because "[s]ubstantial performance will not excuse the nonoccurrence of an express condition precedent to a contract." *Id.* In other words, UP's contention that its own funding of the construction costs that the parties had contemplated would be borne initially by ADM is "close enough" to the condition in the Letter Agreement is not legally enough to salvage performance of the first contingency or to salvage the enforceability of the Letter Agreement. *Id.* Similarly, execution of an operating agreement by CRANDIC and UP *after completion of the construction project* does not satisfy the express conditions precedent in the Letter Agreement concerning such an operating agreement, because one express condition precedent to construction of the project was the *prior* execution of such an operating agreement, and performance that is supposedly "close enough" is not legally enough. *Id.*

Similarly unavailing is UP's contention that it could unilaterally waive the conditions precedent that were not satisfied. Even though whether a condition precedent exists solely for one party's benefit is a question of fact, *see Dergo*, 567 N.W.2d at 444, contrary to UP's contentions, on the record before the court, there is no *genuine* dispute that the conditions precedent in question were *not* solely for UP's benefit. *See Rodgers*, 342 N.W.2d at 806 (a party may waive a condition precedent that is *solely* for its benefit

21

and protection); *Dergo*, 567 N.W.2d at 444 (same). The language of the Letter Agreement clearly indicates that UP and CRANDIC both contemplated and desired the participation of ADM in the funding of construction of the Fairfax Yard project. Specifically, the Letter Agreement states in its first lines that it is based on a three-way agreement to construct the tracks in question. Letter Agreement, Defendant's Appendix at 8. Indeed, the importance of ADM's participation to both parties is apparent from the imposition of ADM's participation and execution of agreements securing that participation as conditions precedent to performance by CRANDIC and UP. *Id.* at 8-9. Moreover, it is clear from the record that CRANDIC *also* would have benefitted from ADM's participation, because ADM would have had an incentive to use the new tracks, thus ensuring that all three interested entities would recoup their investments. On the undisputed record, the participation of ADM was *not* solely for UP's benefit; consequently, UP could not unilaterally waive conditions precedent relating to ADM's participation. *See Rodgers*, 342 N.W.2d at 806; *Dergo*, 567 N.W.2d at 444.

Similrly, there is no genuine issue of material fact that the condition precedent of an operating agreement between CRANDIC and UP was *not* solely for UP's benefit. Rather, neither party could make full use of the Fairfax Yard (or in CRANDIC's case, *any* use of the yard) or expect to enjoy the full benefits of its investment in the construction of the yard in the absence of such an agreement. On the undisputed record, the negotiation of an operating agreement between CRANDIC and UP as a condition precedent to performance under the Letter Agreement was *not* solely for UP's benefit; consequently, UP could not unilaterally waive the condition precedent relating to the operating agreement, either. *See id.*; *Dergo*, 567 N.W.2d at 444.

Nor can the court find any genuine issue of material fact that CRANDIC waived performance of the missing conditions precedent or should be estopped to assert their

22

nonperformance as excusing its own performance, as UP contends. There is plainly no express waiver by CRANDIC, and UP does not contend that there is. *See ARDI Exchange*, 493 N.W.2d at 865 (a party may waive a condition precedent expressly or by conduct). There is also no genuine issue of material fact on the present record that CRANDIC did not make an implied waiver, that is, waiver by conduct. *Id.*; *accord Employee Benefits Plus, Inc.*, 535 N.W.2d at 155 (a condition precedent can be impliedly waived by conduct after the waiving party has knowledge that the condition precedent has not been met). Nothing in the record reasonably suggests that CRANDIC continued its performance under the Letter Agreement, which was only to pay 13.7% of the construction costs of the Fairfax Yard project, after it learned that the condition precedent concerning ADM's participation in the construction project would not be met, because the Letter Agreement did not require performance by CRANDIC *at all* until completion of the construction project. *See* Letter Agreement, ¶ 3(B), Defendant's Appendix at 8 ("CRANDIC will pay UP $1.0 million (or 13.7%) of the total construction cost) as its share of the cost of constructing the Fairfax interchange tracks *at completion of the two Fairfax interchange tracks*, but no earlier than January 2003.") (emphasis added). Moreover, the record shows, beyond dispute, that CRANDIC's overtures to restart negotiations in July 2004 for an operating agreement with UP concerning the Fairfax Yard and the continuation of those negotiations from November 2004 until the operating agreement was actually executed in May 2005 were understood by both CRANDIC and UP to be separate from the Letter Agreement, and not an attempt to satisfy belatedly the condition precedent in the Letter Agreement. UP representatives specifically suggested in November 2004 that the parties pursue an operating agreement separate from the Letter Agreement, and CRANDIC's representatives agreed to that course. Both parties also had reasons to want an operating agreement that were entirely independent of belated

23

fulfillment of the pertinent condition precedent in the Letter Agreement, because such an operating agreement was the only way that CRANDIC would be able to use the Fairfax Yard at all, and one way—probably the best way—that UP would be able to make use of its investment. Moreover, UP could not have reasonably believed that the parties were still attempting to fulfill or waive the conditions precedent in the Letter Agreement, when UP knew that it had not fulfilled all of the conditions precedent prior to commencing construction of the Fairfax Yard, and UP was making no attempt to fulfill the missing conditions precedent at the time that it unilaterally commenced construction of the Fairfax Yard project.

Ultimately, UP has not pointed to any evidence sufficient for a reasonable jury to return a verdict for UP on its express contract claim. *Anderson*, 477 U.S. at 248 (stating this ultimate question for summary judgment purposes). Rather, the only reasonable inference from the record is that UP had decided to "go it alone" once it failed to secure the participation of ADM or an operating agreement with CRANDIC prior to commencement of construction and was not even attempting to do so at the time that it started construction. *See* Letter Agreement, Defendant's Appendix at 9 (construction under the terms of the Letter Agreement was not to begin until agreements were signed between CRANDIC and UP and UP and ADM). Therefore, because UP cannot generate the necessary genuine issues of material fact, and UP's failure to satisfy the conditions precedent to the parties' performance "vitiate[d] the contract" as a matter of law, *see Employee Benefits Plus, Inc.*, 535 N.W.2d at 155, CRANDIC is entitled to summary judgment on UP's express contract claim. *Celotex Corp.*, 477 U.S. at 323 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law").

24

### C.  *UP's Implied Contract Claim*

CRANDIC has also moved for summary judgment on UP's implied-in-fact contract claim.  UP has also resisted summary judgment on this claim.  Although UP contended at oral arguments on CRANDIC's summary judgment motion that the court need only reach this claim it if finds that UP's express contract claim is deficient as a matter of law, that is the circumstance in which the court now finds itself.

### 1.  *Arguments of the parties*

#### a.  *CRANDIC's opening argument*

CRANDIC argues that UP's implied contract claim was pleaded in acknowledgment that UP's express contract claim fails as a matter of law, where the conditions precedent stated in the Letter Agreement were not satisfied.  CRANDIC reads UP's implied contract claim to be a "promissory estoppel" claim, but argues that such a claim fails as a matter of law and undisputed fact.

CRANDIC first argues that UP's implied contract claim fails where it seeks to impose the exact same obligations upon CRANDIC as the express contract claim.  More specifically, CRANDIC argues that the consideration bargained for in an express contract cannot form the basis for detrimental reliance in an implied contract claim, citing copious authority that an express contract and an implied contract cannot exist with respect to the same subject matter and the law will not imply a contract where there is an express contract.  CRANDIC also argues that a promissory estoppel claim is not intended to give a party a second bite at the apple in the event that the party's breach-of-contract claim fails.  Next, CRANDIC argues that UP's implied contract claim fails as a matter of law, because it violates the Iowa statute of frauds, Iowa Code § 622.32, for a contract involving an interest in real estate.

25

Turning to the substance of UP's implied contract claim, CRANDIC contends that UP cannot generate genuine issues of material fact on the question of whether UP reasonably relied on any supposed promise by CRANDIC, where the undisputed facts show that UP decided to go forward on its own with construction of the Fairfax Yard project in 2004, knowing that it had not secured ADM's participation and knowing that CRANDIC could not participate financially in construction of the tracks after 2003. CRANDIC points out that UP ceased negotiating with CRANDIC about an operating agreement in the summer of 2002 and also ceased negotiating with ADM in 2002; that discussions in 2003 made it clear that the project would not proceed in 2003 and that CRANDIC would not participate financially after 2003; that UP engaged in permit negotiations without CRANDIC's involvement; that UP began construction in March 2004 without input or involvement from CRANDIC; that the parties did not renew negotiations about an operating agreement until after construction had begun, and then only at CRANDIC's request; that conduct of UP in a November 11, 2004, conference call and UP's conduct to implement the plan outlined in that conference call manifested a complete absence of reliance by UP on CRANDIC's obligations under the Letter Agreement; that there was no contract between UP and ADM securing ADM's share of the funding for the project and no operating agreement between CRANDIC and UP even at the conclusion of construction; and that UP forgave ADM's obligation to pay 50% of the construction costs up front.

### b.    *UP's response*

In response, UP contends that it properly pleaded an implied contract claim in the alternative to its express contract claim. It argues, further, that if the court finds that the Letter Agreement is unenforceable, the law should imply a contract between UP and CRANDIC and award UP damages based on a theory of unjust enrichment. UP contends

that CRANDIC's obligation to pay its agreed share of the construction costs of the Fairfax Yard project arises from UP's reliance on CRANDIC's representations that CRANDIC would participate in the funding of the project and CRANDIC's failure to notify UP prior to or during construction that CRANDIC intended to withhold its agreed participation in the funding, even though the project would benefit and actually has benefitted CRANDIC.

### c. CRANDIC's reply

In reply in further support of this portion of its summary judgment motion, CRANDIC reiterates that UP cannot base its implied contract claim on the same bargained-for consideration that is the subject of the Letter Agreement. CRANDIC also argues that it simply has not been "unjustly enriched," because UP cannot meet the strict proof required beyond mere nonperformance of a promise required to sustain a "promissory estoppel" claim. CRANDIC points out that the facts it has argued demonstrate lack of reliance by UP remain undisputed. In essence, CRANDIC argues that the record shows beyond dispute that UP decided to go forward on its own with the Fairfax Yard project. CRANDIC also reiterates its assertion that an implied contract claim concerning an interest in real estate violates the Iowa statute of frauds, because UP merely argues in a circle that the Letter Agreement is an adequate writing to satisfy the statute of frauds and UP partially performed the Letter Agreement, but should be granted the benefit of an implied contract where it failed to comply with all of the terms of the express contract.

### 2. Applicable law and analysis

### a. Preliminary matters

The court finds that there are some preliminary matters presented in the parties' arguments that must be addressed before it can turn to the question of whether or not UP has generated genuine issues of material fact on the essential elements of its implied-in-fact contract claim.

27

*i.* ***Bar by express contract claim***.  The first such preliminary matter is CRANDIC's argument that UP's implied contract claim is barred, as a matter of law, by the existence of an express contract pertaining to the same promise.  As CRANDIC suggests, this court finds that numerous decisions of Iowa courts state that an express contract and an implied contract cannot coexist with respect to the same subject matter, and that the law, therefore, will not imply a contract where there is an express contract.  *Scott v. Grinnell Mutual Reinsurance Company*, 653 N.W.2d 556, 562 (Iowa 2002); *Frontier Properties Corp. v. Swanberg*, 488 N.W.2d 146, 149 (Iowa 1992);  *Chariton Feed & Grain, Inc. v. Harder*, 369 N.W.2d 777, 791 (Iowa 1985); *Clemens Graf Droste Zu Vischering v. Kading*, 368 N.W.2d 702, 712 (Iowa 1985); *Maasdam v.. Estate of Maasdam*, 237 Iowa 877, 884, 24 N.W.2d 316, 320 (1946); *Giese Constr. Co. v. Randa*, 524 N.W.2d 427, 431 (Iowa Ct. App. 1994); *see also Johnson v. Dogden*, 451 N.W.2d 168, 175 (Iowa 1990) ("Generally the existence of a contract precludes the application of the doctrine of unjust enrichment.").  However, CRANDIC is mistaken when it argues that this principle bars a party from *asserting* both an express contract claim and an implied contract claim; rather, the bar is only on *recovering* under *both* claims, and a party may plead an implied contract claim as an alternative to an express contract claim.  *Maasdam*, 237 Iowa at 885, 24 N.W.2d at 320 ("One may, of course, plead these causes of action [express and implied contract] in separate counts."); *Russell v. John Clemens & Co.*, 196 Iowa 1121, 1122, 195 N.W. 1009, 1010 (1923); *see generally* Iowa R. Civ. P. 1.402(2)(b) (formerly Rule 69(b)) ("A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal or equitable grounds.").

*ii.* ***Statute of frauds***.  CRANDIC argues, next, that UP's implied contract claim, which CRANDIC characterizes as a "promissory estoppel" claim, violates the Iowa statute of frauds.  The statute of frauds provides that oral evidence of a promise to create

28

or convey an interest in land is incompetent proof of such promise. *See* IOWA CODE § 622.32(3) (1997); *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 630 (Iowa 1996). Proof of such a contract must be in writing and signed by the party to be charged with the alleged contract. *See* IOWA CODE § 622.32 (1997); *Davis v. Roberts*, 563 N.W.2d 16, 20 (Iowa Ct. App. 1997). Proof of the elements of promissory estoppel, however, will remove an oral contract involving an interest in real estate from the statute of frauds. *Kolkman v. Roth*, 656 N.W.2d 148 (Iowa 2003); *Pollmann v. Belle Plaine Livestock Auction, Inc.*, 567 N.W.2d 405, 407 (Iowa 1997) (citing *Johnson v. Pattison*, 185 N.W.2d 790, 795 (Iowa 1971); *Miller v. Lawlor*, 245 Iowa 1144, 1152-53, 66 N.W.2d 267, 272 (1954)). Thus, to the extent that UP's implied contract claim is a "promissory estoppel" claim and UP generates genuine issues of material fact on the elements of such a claim, CRANDIC is not entitled to summary judgment on that claim on the ground that it violates the statute of frauds. *Id.*

*iii.* ***Nature of the claim***. The third preliminary matter that the court must address is the different constructions that the parties give to UP's claim denominated "Contract Implied In Fact." Although CRANDIC construes this claim to be a "promissory estoppel" claim in its motion for summary judgment, UP describes the claim as an "unjust enrichment" claim in its resistance to summary judgment. Thus, the court must determine what kind of claim or claims Count II of UP's Second Amended And Substituted Complaint can reasonably be construed to assert before the court can turn to the question of whether or not UP has generated genuine issues of material fact on such a claim or claims.

To determine what kind of claim is at issue in Count II, the court will begin by examining UP's pleading of that claim. In Count II of its Second Amended And

Substituted Complaint, UP first repleads by reference all of the preceding paragraphs of
its Second Amended And Substituted Complaint, then pleads the following:

> 13.    Defendant CRANDIC allowed Union Pacific to
> proceed at great expense to Union Pacific, with the
> construction of the Fairfax Interchange tracks.  In reasonable
> reliance upon CRANDIC's representation it would pay 13.7%
> of the total construction cost.  While Union Pacific proceeded
> with the construction of the Fairfax Interchange tracks,
> CRANDIC did not advise Union Pacific that it in fact did not
> intend to pay the 13.7% of the total construction costs.
>
> 14.    Union Pacific claims in the alternative that a
> contract between Union Pacific and CRANDIC requiring
> CRANDIC to pay 13.7% of the total construction cost of the
> Fairfax Interchange tracks was manifested by the conduct of
> Union Pacific and CRANDIC, and therefore CRANDIC is
> obligated under a contract implied in fact to pay to Union
> Pacific 13.7% of the total construction cost.

Second Amended And Substituted Complaint, Count II, ¶¶ 13-14.  It is not immediately
apparent whether the reference to pleading "in the alternative" in paragraph 14 is in the
alternative to paragraph 13 or if, instead, is meant to convey that the entirety of Count II
is pleaded "in the alternative" to the express contract claim in Count I.  The court will
proceed on the assumption that UP intended to plead Count II "in the alternative" to
Count I, but that UP *also* intended to plead paragraphs 13 and 14 as "alternative" theories
for a "contract implied in fact."

      The Iowa Court of Appeals has explained, "'When the parties manifest their
agreement by words, the contract is said to be express,'" but "when there 'is merely a tacit
promise, one that is inferred in whole or in part from expressions other than words on the
part of the promisor,' it is said to be implied in fact."  *Iowa Waste Sys., Inc. v. Buchanan
County*, 617 N.W.2d 23, 29 (Iowa Ct. App. 2000) (quoting CORBIN ON CONTRACTS
§ 1.18, at 51).  The Iowa Court of Appeals has also explained that an "implied in fact"

contract—which is what UP purports to plead in Count II—"arises from the conduct of the parties, not merely from their relationship, and requires an expression of assent." *Irons v. Community State Bank*, 461 N.W.2d 849, 855 (Iowa Ct. App. 1990).

In paragraph 14, UP pleaded the essence of an "implied in fact" contract claim by alleging that a contract between CRANDIC and UP to share the costs of construction of the Fairfax Yard project "was manifested by the conduct of [UP] and CRANDIC, and therefore CRANDIC is obligated under a contract implied in fact to pay to [UP] 13.7% of the total construction cost." *See Iowa Waste Sys., Inc.*, 617 N.W.2d at 29 (a contract "implied in fact" is "inferred in whole or in part from expressions other than words on the part of the promisor") (citations omitted); *Irons*, 461 N.W.2d at 855 (an "implied in fact" contract "arises from the conduct of the parties, not merely from their relationship, and requires an expression of assent"). Moreover, UP has pleaded, although perhaps somewhat inartfully, the elements of the most common kind of "implied in fact" contract claim, which is described by "the antiquated term" *quantum meruit*. *Iowa Waste Sys., Inc.*, 617 N.W.2d at 29. To succeed on such an "implied in fact" contract claim, the Iowa Supreme Court has explained that the party seeking recovery must show the following: (1) that services were carried out under such circumstances as to give the recipient reason to understand (a) that they were performed for him and not some other person, and (b) that they were not rendered gratuitously, but with the expectation of compensation from the recipient; and (2) that the services were beneficial to the recipient. *Roger's Backhoe Serv., Inc. v. Nichols*, 681 N.W.2d 647, 652 (Iowa 2004) (citing *Iowa Waste Sys., Inc.*, 617 N.W.2d at 30); *Scott v. Grinnell Mut. Reins. Co.*, 653 N.W.2d 556, 562 (Iowa 2002) (also citing *Iowa Waste* for these elements). It is apparent that, in Count II of UP's Second Amended Complaint, UP has attempted to plead that it carried out the Fairfax Yard construction project under such circumstances as to give CRANDIC reason to understand

31

that the construction was performed for CRANDIC, with an expectation that CRANDIC would pay its agreed share of the construction costs, and that the construction project was beneficial to CRANDIC. *See id.* (identifying these elements of an "implied in fact" contract claim). Thus, the court concludes that UP's "Contract Implied In Fact" claim can reasonably be construed as the claim denominated as an "implied-in-fact contract" claim in Iowa cases and, still more specifically, that the claim can reasonably be construed to be in the subclass of "implied-in-fact contract" claims identified by the "antiquated term" *quantum meruit*.

CRANDIC, however, has construed the claim to be a "promissory estoppel" claim. Assuming that "promissory estoppel" is an "implied in fact" contract theory, a proposition for which this court has found no clear support in Iowa cases, the Iowa Supreme Court has explained that, to succeed on such a claim, the plaintiff must prove the following: (1) a clear and definite promise; (2) the promise was made with the promissor's clear understanding that the promisee was seeking assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his or her substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise. *Kolkman*, 656 N.W.2d at 156; *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 49 (Iowa 1999). "Strict proof" is required for all of the elements of such a claim, including "strict proof of a promise that justifies reliance by the promisee," and "strict proof that the reliance inflicted injustice that requires enforcement of the promise." *Id.* Thus, "much more than mere nonperformance of a promise must be shown to obtain the benefits of promissory estoppel." *Id.* The court finds that UP has at least attempted to plead the elements of a "promissory estoppel" claim in Count II of its Second Amended And Substituted Complaint. UP alleges in paragraph 13 that it had a promise from CRANDIC to pay 13.7% of the total construction cost of the Fairfax Yard

32

project, that it built the yard "at great expense," *i.e.*, it acted to its substantial detriment, and "in reasonable reliance" on that promise, and it can at least be inferred from the pleading that UP contends that it is unjust not to enforce CRANDIC's promise to pay its share. *Cf. id.* Thus, the court finds that UP's "Contract Implied In Fact" claim could reasonably be construed as a "promissory estoppel" claim.

Notwithstanding either its denomination of the second claim in its Second Amended And Substituted Complaint as a "Contract Implied In Fact" claim or CRANDIC's construction of that claim as a "promissory estoppel" claim, UP describes the claim in its resistance to CRANDIC's motion for summary judgment as an "unjust enrichment" claim. Iowa cases discussing "implied" contracts demonstrate that "implied contract" and "unjust enrichment" claims are often pleaded as alternatives. *See, e.g., Iowa Waste Sys., Inc.*, 617 N.W.2d at 29-30 (discussing alternative claims of "implied in fact contract" and "unjust enrichment"). Even so, while Iowa courts have not been entirely consistent on the point, the Iowa Court of Appeals has explained that Iowa law does not treat "unjust enrichment" as a species of implied-in-fact contract, but as a "remedy of restitution" that is "not grounded in contract law" at all, but is, instead, "rooted solely in equitable principles," and is "the modern designation for the doctrine of quasi contracts or contracts implied in law." *See, e.g., Iowa Waste Sys., Inc.*, 617 N.W.2d at 29-30 (explaining the distinction in a case where the plaintiff pleaded both "quantum meruit," which the court described as a "subclass of implied-in-fact contracts," and "unjust enrichment"); *accord Irons*, 461 N.W.2d at 855-57 (also distinguishing an "unjust enrichment" claim, which is a "quasi contract" or "contract implied in law" claim, from a "contract implied in fact" claim). Thus, an "unjust enrichment" claim does not fit within the scope of a claim denominated "Contract Implied In Fact," because it is, under Iowa law, a "restitution" claim in equity or a "quasi contract" or "contract implied in law" claim.

33

Nor is the court convinced that UP has pleaded the elements of an "unjust enrichment" claim at all; certainly, UP did not plead the elements of such a claim as overtly as it pleaded the elements of "promissory estoppel" in its "Contract Implied In Fact" claim. "Unjust enrichment" requires the claimant to prove the following: (1) that the claimant conferred a benefit upon the other party to its own detriment; (2) the other party had an appreciation of receiving the benefit; (3) the other party accepted and retained the benefit under circumstances making it inequitable for there to be no return payment for its value; and (4) there is no at-law remedy that can appropriately address the claim. *Iowa Waste Sys., Inc.*, 617 N.W.2d at 30 (citing *Irons*, 461 N.W.2d at 855). Nevertheless, with only some stretch of the imagination, one could infer from Count II of UP's Second Amended And Substituted Complaint that UP was attempting to plead that it conferred the benefit of construction of the Fairfax Yard project on CRANDIC, that CRANDIC appreciated that it was receiving the benefit, and that CRANDIC has retained the benefit without ever indicating that it did not intend to pay its share of the total construction costs. Therefore, the court concludes, albeit reluctantly and with considerable reservations, that UP's "Contract Implied In Fact" claim could also be construed as an "unjust enrichment" claim.

### b. *Substance of the claim*

Preliminary matters aside, CRANDIC also contends that UP cannot generate genuine issues of material fact on the essential elements of its "Contract Implied In Fact" claim, whatever kind of claim that claim is construed to be. The court will consider whether UP has generated the necessary genuine issues of material fact on each of the claims that the court has concluded UP's "Contract Implied In Fact" claim could reasonably be construed to be.

34

*i.* *"Implied in fact" contract claim*. Although the court concluded, above, that UP has *pleaded* what is ordinarily denominated as a "contract implied in fact" claim, otherwise identified by Iowa courts as a *quantum meruit* claim, the court finds that UP has failed to generate genuine issues of material fact on essential elements of such a claim. The elements of such a claim, again, are the following: (1) that services were carried out under such circumstances as to give the recipient reason to understand (a) that they were performed for him and not some other person, and (b) that they were not rendered gratuitously, but with the expectation of compensation from the recipient; and (2) the services were beneficial to the recipient. *Roger's Backhoe Serv., Inc.,* 681 N.W.2d at 652; *Scott*, 653 N.W.2d at 562; *Iowa Waste Sys., Inc.*, 617 N.W.2d at 30. While there is no genuine dispute that construction of the Fairfax Yard project ultimately was beneficial to CRANDIC, *id.* (second element), UP's claim founders on the first element. The record demonstrates beyond dispute that the circumstances were *not* such that CRANDIC was given to understand that construction of the Fairfax Yard was *for CRANDIC*, and not some other entity. *Id.* (element (1)(a)). Rather, upon the present record, it is clear that CRANDIC, like UP and ADM, would have understood that the Fairfax Yard was, *as originally contemplated*, intended to benefit all three entities, for example, in light of the first paragraph of the Letter Agreement. Moreover, under the circumstances *at the time of the actual construction* of the Fairfax Yard, the circumstances were such that CRANDIC would have reasonably understood that UP was undertaking the construction project *on its own* for *UP's (and possibly ADM's) benefit*, and UP did nothing to convey a different understanding. This is so, because CRANDIC and UP both knew that UP had not fulfilled the conditions precedent to the construction project, either engaging ADM's participation or executing an operating agreement between UP and CRANDIC, and that CRANDIC had notified UP that it had only booked the money allocated to CRANDIC's budget for the

35

project for 2003, but UP did not commence the project until March 2004. Similarly, because UP had not completed the conditions precedent or attempted to negotiate an amendment to eliminate them and was proceeding after CRANDIC had notified UP that it only had the money for the project booked in its 2003 budget, and UP never stated an expectation that CRANDIC would, nevertheless, contribute to the project, there is no genuine issue of material fact that UP ever conveyed to CRANDIC that it was not rendering the service gratuitously, but with the expectation that CRANDIC would compensate UP for CRANDIC's share of the project. *Id.* (element (1)(b)). Thus, construed as a *quantum meruit* claim, UP's "Contract Implied In Fact" claim fails as a matter of law.

> ***ii.*** ***"Promissory estoppel" claim***. When construed as a "promissory estoppel" claim, UP's "Contract Implied In Fact" claim is also deficient as a matter of law and undisputed fact. Again, to prove a "promissory estoppel" claim, UP must present "strict proof" of the following: (1) a clear and definite promise; (2) the promise was made with the promissor's clear understanding that the promisee was seeking assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his or her substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise. *Kolkman*, 656 N.W.2d at 156; *Schoff*, 604 N.W.2d at 49.

UP has generated genuine issues of material fact of a "clear and definite promise," *id.* (first element), by pointing to the terms of the Letter Agreement, but that "clear and definite promise" clearly and definitely included the conditions precedent that UP is trying to read out of the implied contract claim. To put it another way, a "promissory estoppel" theory cannot be used to escape conditions precedent stated in an express agreement, where a party asserts that an express agreement otherwise states the "clear and definite

promise" upon which the "promissory estoppel" claim is based. UP has cited no authority that allows it to "cherry pick" terms of an express agreement that it likes (or has fulfilled), and disregard other terms that it does not like (or plainly hasn't fulfilled), and enforce only those terms it favors on a "promissory estoppel" or other implied or quasi contract theory. Thus, while the first element is satisfied as a matter of law, as a matter of law and undisputed fact, the "clear and definite promise" at issue here includes the conditions precedent in the Letter Agreement.

In contrast, there is no genuine issue of material fact that UP has *not* satisfied the second element of a "promissory estoppel" claim, because as a matter of undisputed fact, UP cannot show that CRANDIC made a promise of performance with a clear understanding that UP was seeking assurances upon which UP could rely and without which it would not act. *Id.* (second element). Instead, the record demonstrates that, when the conditions precedent to the promise at issue here were not met, UP did act without either CRANDIC's or ADM's involvement, as required by the terms of the promise.

As to the third element, while UP may have shown that it acted to its detriment by incurring the costs of the Fairfax Yard construction project, it cannot show that it did so in reasonable reliance upon any promise by CRANDIC. *Id.* (third element). CRANDIC notified UP twice in 2003 that it only had its share of the money for the project in its budget for 2003, and UP did nothing to obtain assurances that CRANDIC would carry over funding into 2004. UP could not reasonably rely on its *assumption* that CRANDIC would carry over the budget item, where UP did nothing to verify that CRANDIC would or could do so after notice that CRANDIC only had the funds available for 2003. UP's mere assumption about CRANDIC's ability to carry over funds falls far short of the "strict proof" required of "a promise that justifies reliance by the promisee." Id.

Finally, as to this claim, there is no genuine issue of material fact that injustice can only be avoided by enforcing only the parts of the promise that UP seeks to enforce. *Id.* (the fourth element requires proof that injustice can be avoided only by enforcement of the promise). It might be unjust not to enforce CRANDIC's payment of the share of the construction project that it originally agreed to bear if UP had sought and obtained assurances of CRANDIC's continued participation in the project after CRANDIC informed UP that it only had its share of the funds for the project in its budget for 2003 and was willing to go forward on the distinctly different terms presented when UP actually began construction in 2004. Unfortunately for UP, there is no genuine issue of material fact that such a situation is *not* presented on the present record. Here, it is undisputed that UP simply went ahead unilaterally with a construction project after it failed to meet the conditions precedent that were part of CRANDIC's promise to help pay for the project and did so only in 2004 after notice from CRANDIC that its funding would not be available after 2003. Moreover, any supposed injustice in allowing UP to bear the full costs of the construction project that it unilaterally incurred is further mitigated by the fact that UP could have used the terms of the operating agreement eventually negotiated between UP and CRANDIC to recoup some of the costs of the construction of the Fairfax Yard. Thus, UP's "Contract Implied In Fact" claim, construed as a "promissory estoppel" claim, fails as a matter of law.

iii. ***"Unjust enrichment" claim.*** Nor does UP fare better when its "Contract Implied In Fact" claim is construed as an "unjust enrichment" claim. Again, to succeed on such a claim, UP must prove the following: (1) that the claimant conferred a benefit upon the other party to its own detriment; (2) the other party had an appreciation of receiving the benefit; (3) the other party accepted and retained the benefit under circumstances making it inequitable for there to be no return payment for its value; and (4)

there is no at-law remedy that can appropriately address the claim. *Iowa Waste Sys., Inc.*, 617 N.W.2d at 30 (citing *Irons*, 461 N.W.2d at 855). Even assuming that UP can generate genuine issues of material fact on the first two elements of such a claim, it cannot generate genuine issues of material fact on the remaining two elements.

Upon the undisputed facts in the record, CRANDIC did not accept and retain any benefit of the construction of the Fairfax Yard project under circumstances making it inequitable for CRANDIC not to return some payment for the value of that benefit. *Id.* (third element). CRANDIC did not accept or retain any benefit of UP's construction of the yard after notifying UP that it only had its share of the funds for the project budgeted for 2003; rather, until and unless the parties negotiated an operating agreement after UP unilaterally commenced construction of the yard, CRANDIC could not obtain any benefit at all from the project. There is also no injustice in allowing UP to bear the full costs of the project, where it is beyond dispute that UP chose to go forward without the participation of either ADM or CRANDIC. Moreover, any supposed injustice is, again, further mitigated by the fact that UP could have used the terms of the operating agreement eventually negotiated between UP and CRANDIC to recoup some of the costs of the construction of the Fairfax Yard. Here, as in *Iowa Waste Systems*, "[t]he series of events surrounding [UP's] claim . . . simply do not appeal to th[e] underlying sense of justice," as required to prove the claim. *Id.* at 31. Finally, where there is no injustice to remedy, there is no showing that no at-law remedy can appropriately address the claim. *Id.* at 30 (fourth element). Thus, UP's "Contract Implied In Fact" claim, construed as an "unjust enrichment" claim, also fails as a matter of law.

Therefore, CRANDIC is entitled to summary judgment in its favor on UP's "Contract Implied In Fact" claim.

### III. CONCLUSION

The court finds that UP has failed to generate genuine issues of material fact on essential elements of its "express" contract claim, because there is no genuine issue of material fact that UP failed to satisfy all of the express conditions precedent to CRANDIC's performance stated in the Letter Agreement. Similarly, the court finds that UP has failed to generate genuine issues of material fact on its "implied" contract claim, whichever of the theories nominated by the parties that claim is construed to assert. Where a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323. Under the circumstances presented here, UP has failed to make the necessary showing on either of its claims, and CRANDIC is entitled to summary judgment in its favor on both claims. *Id.*

THEREFORE, CRANDIC's November 11, 2006, Motion For Summary Judgment (docket no. 25) is **granted** on both Count I and Count II of UP's Second Amended And Substituted Complaint (docket no. 20). Judgment shall enter accordingly.

**IT IS SO ORDERED.**

**DATED** this 9th day of February, 2007.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

40